# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE:<br><br>ASI CAPITAL INCOME FUND, LLC<br><br>　　　　　　Debtor. | Case No. 20-14066-EB<br>Chapter 11 |
| IN RE:<br><br>ASI CAPITAL, LLC<br><br>　　　　　　Debtor. | Case No. 20-14067-EB<br>Chapter 11<br><br><br>(Jointly administered Under<br>Case No. 20-14066-EEB) |

## FINAL FEE APPLICATION OF LEWIS, BRISBOIS, BISGAARD & SMITH LLP FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

Lewis, Brisbois, Bisgaard & Smith LLP ("**LBBS**"), bankruptcy counsel for ASI Capital LLC ("**ASIC**") and ASI Capital Income Fund, LLC ("**ASICIF**"), the debtors and debtors in possession herein (collectively, the "**Debtors**"), pursuant to 11 U.S.C. §§ 328, 330, and 503(b), Federal Rule of Bankruptcy Procedure 2016, L.B.R. 2016-1, and in accordance with U.S. Department of Justice, Executive Office for United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses filed under 11 U.S.C. § 330, applies for final compensation of fees for services rendered and reimbursement of expenses incurred in the amount of $735,326.04, which consists of  (i) legal fees in the amount of $726,442.50  for services rendered from June 14, 2020 through May 11, 2021  (the "**Application Period**"), and (ii) expenses in the amount of $8,883.54 incurred by LBBS during the Application

Period.

Pursuant to L.B.R. 2016-1(a)(4) LBBS proposes the following allocation of fees and expenses between the two bankruptcy estates:  (i) ASIC – legal fees in the amount of $170,828.50 and expenses in the amount of $1,831.05; (ii) ASICIF - legal fees in the amount of $555,614.00 and expenses in the amount of $7,052.49.  The methodology for the proposed allocation is set forth and explained below.

In support of this Application, LBBS respectfully represents as follows:

## I. RETENTION OF APPLICANT, DISCLOSURE OF COMPENSATION, AND   REQUESTED AWARD

1. On June 14, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continued to operate their businesses as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2. On June 15, 2020, the Debtors filed a motion for joint administration of their Chapter 11 cases.  Dkt. No. 4.  By order dated June 16, 2020, the Court granted the motion and ordered that these cases should be  jointly administered.  Dkt. No. 5.

3. On June 19, 2020, the Debtors applied to retain LBBS as their bankruptcy counsel, *nunc pro tunc* the Petition Date.  Dkt. No. 14.  Thereafter, the Debtors filed an amended application to employ LBBS, again, *nunc pro tunc* to the Petition Date.  Dkt. No. 42.  After a non-evidentiary hearing, the Court granted the Debtors' amended application, with certain conditions, by Orders dated August 27, 2020.  Dkt. Nos. 119, 121, 122.

4. In their application to employ LBBS, the Debtors disclosed that they had both paid LBBS a retainer in the amount of $25,000 before the Petition Date and that, prior to the Petition Date, both retainers had been exhausted.

5. Through this application, LBBS applies for interim compensation of fees for

services rendered and reimbursement of expenses incurred in the amount of $735,326.04, which consists of (i) legal fees in the amount of $726,442.50 for services rendered during the Application Period, and (ii) expenses in the amount of $8,883.54 incurred by LBBS during the Application Period.

## II.   TERMS AND CONDITIONS OF EMPLOYMENT AND COMPENSATION

6.   The Debtors retained LBBS to represent them on an hourly basis.  The hourly rates approved by the Court in authorizing employment by the Debtors were as follows: Partners - $550/hr.; Associates - $375/hr.; Paralegals - $175/hr.; and Law Clerks - $175/hr.  However, as set forth below, LBBS has voluntarily lowered its billing rates for the purpose of this final fee application.  Specifically, Mr. Lubitz's hourly rate has been lowered from $550/hr. to $450/hr., Associate rates have been lowered from $375/hr. to $300/hr., and Paralegal and Law Clerk rates have been lowered from $175/hr. to $125/hr.  This voluntary reduction in LBBS' hourly billing rates, when coupled with LBBS' voluntary write offs and write downs of time entries,  has resulted in a savings to the bankruptcy estates during the Application Period in the total amount of $41,430.00.

7.    Biographical information regarding the LBBS attorneys who performed the work on the Debtors' cases during the Application Period can be found at www.lewisbrisbois.com.

8.   Other than as provided for and allowed by 11 U.S.C. § 504, there is no agreement between LBBS and any other firm, person or entity for the sharing or division of any compensation paid or payable to LBBS.

## III.   THE STATUS OF THE CASES

9.   After commencing their cases, the Debtors worked diligently to prepare and file, among other documents, the documents required by Rule 1007 of the Federal Rules of Bankruptcy

Procedure, including their statements of financial affairs and schedules of assets and liabilities. Certain of those filings were subsequently amended to include information requested by the Office of the United States Trustee (the "**UST**"), to correct certain calculation errors, and to expand upon information previously provided.

10.     Thereafter, the Debtors participated in the Initial Debtor Interview conducted by the UST, appeared at an initial and, later, adjourned session of the meeting of creditors required under 11 U.S.C. § 341(a), and began to file Monthly Operating Reports as required by the UST and have continued to do so on a timely basis.

11.     The Debtors also began to file motions pursuant to 11 U.S.C. § 363 seeking authorization from the Court to respond to cash calls, to make cash infusions, and to make loans to entities in which they had invested before the Petition Date.  Some of those motions drew objections by one or more parties in interest, but all of those objections were in due course resolved, and all of the motions were granted.  As a result, the Debtors were successful in preserving and protecting the value of their assets as of the Petition Date, even amidst the continued harsh economic impact due to the global COVID-19 pandemic.

12.     Pursuant to Rule 2004 motions and orders entered thereon, the Debtors responded to a number of document requests and produced four witnesses in connection with Rule 2004 examinations.

13.     Pursuant to 11 U.S.C. § 1121(d)(1), the Debtors moved for and obtained an extension to have the exclusive right to file a plan of reorganization for an additional 120 days, through and including February 9, 2021, and to solicit acceptances thereof for an additional 180 days, through and including April 10, 2021.

14.     Finally, on February 5, 2021, the Debtors filed a motion for voluntary dismissal on

the ground that all but a few of their investors had signed forbearance agreements in exchange for the Debtors signing new security agreements and perfecting the investors' security interests through filings with the Secretaries of State of Wyoming and Colorado after the cases had been dismissed.

15.     A hearing was held on the Debtors' motion for dismissal on March 18, 2021.  At the conclusion of the hearing, the Court advised that it would grant the motion in part and deny the motion in part.  Specifically, the Court would order dismissal of the Debtors' cases but would not extend the automatic stay of 11 U.S.C. § 362(a).  As to the administrative relief the Debtors' had requested, the Court gave the Debtors until March 22, 2021 to file a status report on whether the Debtors would agree to the entry simple dismissal orders.  After the Debtors filed their status report advising that they would agree to the entry of simple dismissal orders, the Equity Members Conflicts Committee filed their own status report in which they asked the Court to include in the dismissal orders an express reservation of ancillary jurisdiction to rule on applications for professional fees.

16.     Because two status reports had been filed, the Court set a status conference for April 6, 2021.  Because it was agreed that the Court had inherent ancillary jurisdiction to rule on professional fee applications, the Court ruled that the express reservation requested by the Conflicts Committee was not necessary and entered simple dismissal orders in both cases later that day.  The Court also ordered that applications for compensation under 11 U.S.C. § 330 had to be filed by May 3, 2021.  The Court later extended that deadline to May 17, 2021.

## IV.    SERVICES RENDERED

17.     To provide the Court and parties-in-interest with understandable information concerning the nature of services rendered by LBBS during the Application Period, attached as

"Exhibit 1" and "Exhibit 2" are LBBS' invoices for services rendered and monies advanced during the Application Period.  Even though these cases are being jointly administered, from the outset of its engagement, LBBS set up separate client-matter numbers for ASIC and ASICIF.  If the work performed on a matter was exclusively for the benefit of ASIC and its estate, the time entry was made under the ASIC client-matter number.  If, on the other hand, the work performed on a matter was exclusively for the benefit of ASICIF and its estate, the time entry was made under the ASICIF client-matter number.  Finally, if the work performed on a matter was of benefit to both ASIC and its estate, and ASICIF and its estate, the time entry was, for the purposes of a placeholder only, equally split between the ASIC client-matter number and the ASICIF client matter number.  Thus, for example, if one of LBBS' attorneys were to have entered 0.2 hours of time exchanging emails with the attorney for UST regarding the 11 U.S.C. § 341(a) meeting of creditors, which was conducted simultaneously in the two cases, that attorney would have entered 0.1 hours in client-matter number 48272-3 (ASICIF) and 0.1 hours in client-matter number 48273-3 (ASICIF).  But again, that was for placeholding purposes only, and does mean that LBBS proposed that the time should be allocated 50/50 between the two estates.

18.     Pursuant to L.B.R. 2016-1(a)(4), LBBS proposes that its fees and expenses be allocated between the two estates on the following basis:  (1) If the work performed on a matter was exclusively for the benefit of ASIC and its estate, the fees for that work should be allocated to the estate of ASIC only;  (2) conversely, if the work performed on a matter was exclusively for the benefit of ASICIF and its estate, the fees for that work should be allocated to the estate of ASICIF only; and  (3) finally, if  the work performed on a matter was of benefit to both ASIC and its estate, and ASICIF and its estate, the fees for that work should be allocated between estate of ASICIF and the estate of ASIC on an 90/10 basis.  By way of example, if one of LBBS' attorneys were to

have entered a total of 2.00 hours of time for participating in the 11 U.S.C. § 341(a) meeting of creditors, 1.8 hours of the time should be allocated to the estate of ASICIF and 0.2 hours of the time should be allocated to the estate of ASIC.

19.     In its interim fee application, LBBS proposed allocating fees associated for work performed that was of benefit to both ASIC and ASICIF on a proposed 80/20 split which is roughly the equivalent of the ratios of ASICIF's scheduled assets and ASIC's scheduled assets (83% and 17%), and of ASICIF's scheduled liabilities and ASIC's scheduled liabilities (77% and 23%).  The only other way to allocate those fees would be on an arbitrary 50/50 basis, but that would result in the creditors of the much smaller estate unfairly subsidizing the creditors of the much larger estate. Although not as extreme, that would be the same as a parent debtor with $1 million in assets and liabilities and a subsidiary debtor with $100 million in assets and liabilities splitting fees for mutually beneficial legal work on a 50/50 basis.  After having completed the efforts associated with seeking signatures from investors on Forbearance Agreements related to the dismissal process, however, LBBS has since determined that the relative number of Noteholders and Bondholders also bears on the appropriate allocation of fees.  ASICIF has155 bondholders, and yet ASIC has only 86 noteholders.  Thus, nearly twice as many bondholders were benefited by the forbearance/security interest/dismissal process than noteholders.   The number of investors benefited by the process should also be taken into account in allocating fees between ASICIF and ASIC.  LBBS believes that a 90/10 split between ASICIF and ASIC is a fair and equitable method of allocating legal fees for work that was for the benefit to both Debtors and their respective creditors.

20.     LBBS' invoices set forth in chronological order the date on which a service was rendered, the initials of the timekeeper who performed the service, a description of the services

rendered and the amount of time, in tenths of an hour, it took to perform the service. The first several pages of each invoice summarize various categories of services rendered by LBBS using separate billing codes (*e.g.*, "B110" for "Case Administration") based on the nature of the services performed. The summaries include the identification of the timekeepers who performed the services, their titles, the number of hours each timekeeper billed to matters within each billing category, their hourly rates, and the amount billed based on their respective hours and hourly rates. The hours and resulting fees for each billing category are included in each summary as a Subtotal for each of the client-matter numbers and as a Total for both client-matter numbers.

21.     All of the services for which compensation is requested were services which, in LBBS' judgment, were necessarily rendered after due consideration of the expected cost and anticipated benefit of such services. All time described in LBBS' invoice represents the actual amount of time spent or, in certain instances, less than the actual amount of time spent by the LBBS timekeeper who rendered the described services. Finally, time entries which are shown as "No Charge" are the result of the exercise of LBBS' billing judgment, and for informational purposes only, and are not included in the final compensation requested by the application.

### B110 – Case Administration

22.     The services performed by LBBS under this billing category consisted primarily of assisting the Debtors with the preparation of their statements of financial affairs, schedules of assets and liabilities, and filings required by Rule 1007, including assisting in the preparation of amendments to those filings. LBBS' services also included assisting the Debtors with their Monthly Operating Reports, responding to Rule 2004 examinations and document requests, preparing for an attending numerous Rule 2004 examinations, and filing case administration

motions such as twice moving for an extension of the exclusivity periods of 11 U.S.C. § 1121.[1]

| Timekeeper[2] | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 91.80 | $50,490.00 | 118.20 | $65,010.00 | $115,500.00 |
| JGL | Partner | $450/hr. | 48.00 | $21,600.00 | 52.30 | $23,535.00 | $45,135.00 |
| AB | Assoc. | $300/hr. | 18.40 | $5,520.00 | 14.90 | $4,470.00 | $9,990.00 |
| BRD | Assoc. | $300/hr. | 0.60 | $75.00 | 0.70 | $87.50 | $162.50 |
| MD | Para. | $175/hr. | 0.00 | $0.00 | 1.90 | $237.50 | $237.50 |
| | | Subtotal | 158.80 | $77,685.00 | 188.00 | $93,340.00 | $171,025.00 |

Proposed allocation of Total Amount:  ASIC - $17,102.50; ASICIF - $153,922.50

**B120 - Asset Analysis and Recovery**.

23.     This billing category includes matters relating to the analysis and recovery of contingent assets.

24.     The services performed by LBBS under this billing category consisted of obtaining information regarding and gaining an understanding of the ASIC's rights to the proceeds of a policy of insurance under which one of its wholly-owned subsidiaries, TVO Hospitality, LLC, is the named insured.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 2.30 | $1,265.00 | 1.50 | $825.00 | $2,090.00 |
| JGL | Partner | $450/hr. | 4.50 | $2,025.00 | 0.00 | $0.00 | $2,025.00 |
| | | Subtotal | 6.80 | $3,290.00 | 1.50 | $ 825.00 | $4,115.00 |

Proposed allocation of Total Amount:  ASIC - $3,290.00; ASICIF - $825.00

**B130 – Asset Disposition**

25.     This billing category includes matters relating to responding to inquiries regarding the potential sale of assets of the Debtors during the pendency of the cases.

---

[1] Certain time entries that appear under billing category B170 on LBBS's invoices have been transferred to B110 for purposes of this analyis.
[2] Timekeeper abbreviations:  JCP = John Cardinal Parks; JGL = John G. Lubitz; RSL = Richard S. Lauter; AB = Arthur Biller; MLG = Maria L. Gonzalez; BH = Brendan Hamill; BRD = Brian R. DeMocker; MC = Matthew Clark; MD = Magdalena Diaz.

26.     The services performed by LBBS under this billing category consisted of sending and receiving email correspondence regarding an interest expressed by Roma Commercial, Inc. ("**Roma**") in acquiring ASIC's interest in High Desert Garden Holdings and regarding interest expressed by other parties in purchasing assets of the Debtor's estates.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 0.70 | $385.00 | 0.60 | $330.00 | $715.00 |
| MC | Para | $125/hr. | 0.80 | $100.00 | 0.70 | $87.50 | $187.50 |
| | | **Subtotal** | **1.50** | **$ 485.00** | **1.30** | **$ 417.50** | **$ 902.50** |

Proposed allocation of Total Amount:  ASIC - $485.00; ASICIF - $417.50

### B140 - Relief from Stay/Adequate Protection Proceedings

27.     This billing category includes matters relating to termination or continuation of automatic stay under 11 U.S.C. § 362 and motions for adequate protection.

28.     The services performed by LBBS under this billing category consisted of responding to two motions for relief from stay filed by **Roma.**

29.     The two motions for relief from stay filed by Roma required LBBS to prepare and file briefs in opposition to the motions and a supplemental brief regarding one of the motions after the hearing on the motion had been adjourned.  LBBS also had to prepare for and participate in the hearing on the motions.

30.     It has been suggested that the two motions for relief from stay filed by Roma were not anything out of the ordinary.  In fact, they were out of the ordinary.  The first motion for relief from stay filed by Roma involved a lawsuit it had filed in El Paso, Texas that involved numerous parties and a complex factual and procedural history.  The issue, as ASIC saw it, was whether Roma was entitled to relief from stay as to ASIC since (i) its original petition did not name ASIC as a defendant and Roma did not assert any claims against ASIC until ASIC had intervened in the

suit, and (ii) there had been no showing that Roma could not obtain complete relief by pursuing

its claims against the original defendants only.  In short, it was not the typical single plaintiff

seeking relief from stay to pursue a prepetition claim against a single, debtor defendant.

31.     The other motion for relief from stay filed by Roma involved a far more complex

issue:  whether the filing of ASIC's Chapter 11 petition stripped ASIC of all of its management

rights in High Desert Garden Holdings, a Delaware limited liability company that owns a Hilton

Garden Inn in El Paso, Texas.  LBBS directs the Court's and the parties' attention to Roma's

motion (Dkt. No. 109), ASIC's objection (Dkt. No. 150), Roma's supplemental brief (Dk. No.

205), and ASIC's supplemental brief (Dkt. No. 206) (all of which total 99 pages) to gain some

appreciation of the complex legal issues presented by Roma's motion.  Although the briefing was

closed in October 2020, the Court never reset the hearing and never ruled on the motion before

dismissing ASIC's case in April 2021, suggesting that it was not a run of the mill relief from stay

proceeding.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 29.70 | $16,335.00 | 0.00 | $0.00 | $16,335.00 |
| JGL | Partner | $450/hr. | 1.90 | $855.00 | 0.00 | $0.00 | $855.00 |
| AB | Assoc. | $300/hr. | 2.10 | $630.00 | 0.00 | $0.00 | $630.00 |
| MLG | Assoc. | $300/hr. | 24.30 | $7,290.00 | 0.00 | $0.00 | $7,290.00 |
| | | Subtotal | 58.00 | $25,110.00 | 0.00 | $  0.00 | $25,110.00 |

Proposed allocation of Total Amount:  ASIC - $25,110.00; ASICIF - $0.00

### B150 - Meetings of and Communications with Creditors

32.     This billing category includes preparing for and attending the 11 U.S.C. § 341(a)

meeting and other communications with creditors.

33.     The services performed by LBBS under this billing category related primarily to

preparing for and attending the initial and adjourned sessions of the section 341(a) meetings of

creditors.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 14.80 | $8,140.00 | 9.60 | $5,280.00 | $13,420.00 |
| JGL | Partner | $450/hr. | 4.90 | $2,205.00 | 0.00 | $0.00 | $2,205.00 |
| | | **Subtotal** | **19.70** | **$10,345.00** | **9.60** | **$5,280.00** | **$15,625.00** |

Proposed allocation of Total Amount:  ASIC - $1,562.50; ASICIF - $14,062.50

### B160 - Fee/Employment Applications

34.     The services performed by LBBS under this billing category related to preparing and filing documents in connection with the Debtors' applications and amended applications to employ LBBS as their bankruptcy, responding to objections thereto, and preparing for and attending a non-evidentiary hearing on the amended applications.

35.     The services also included filing an application to employ BKD, LLP, to prepare ASIC's 2019 tax returns, filing an application to employ the Gordon Davis firm to represent ASIC in the Roma litigation after the stay was lifted, preparing and filing BKD's final fee application, and assisting Gordon Davis in the preparation and filing of its final fee application.

36.     Also included in this billing category are activities related to the preparation, filing, and prosecution of LBBS' first interim fee application as well as this, its final fee application. Although LBBS' first interim fee application was withdrawn after it had become clear that none of it fees could be paid before the end of 2020, that application has assisted in the preparation of this application and shortened the amount of time required to prepare it.

37.     With respect to the objections to the Debtors application to employ LBBS as their bankruptcy counsel in these cases, the UST's argued in its objection to LBBS' first interim fee application that LBBS should not receive any compensation for opposing the UST's objection as well as the two other objections on the ground that LBBS had created a conflict of interest between

the Debtors and their manager, The Convergence Group ("**TCG**").  As LBBS has noted numerous times, although TCG may have signed the engagement letter pursuant to its management authority, LBBS was hired to assist and perform legal services for the entities that TCG manages, including the Debtors.  For example, all of the work performed by LBBS in May and early June of 2020 in an effort to persuade noteholders and bondholders to sign forbearance agreements was on behalf of and for the benefit of the Debtors, not TCG.

38.     To draw an analogy from Hollywood, if, in the film *Jerry Maguire*, Tom Cruise had signed an engagement letter with LBBS to assist Cuba Gooding, Jr. in negotiations with the Arizona Cardinals, and Mr. Gooding's character were to later file a Chapter 11 petition and seek to employ LBBS, the UST would object to the application to employ LBBS on the ground that LBBS had a conflict of interest.  With no disrespect to the UST intended, LBBS submits such a notion of conflicts of interest is way out of bounds.

39.     Moreover, the UST withdrew its objection to LBBS employment on the condition that the Court order the Debtors to engage special counsel in the event that, at some point in the future, a conflict might happen to arise between the Debtors and TCG.  LBBS did not object to that condition simply for the sake of moving the cases along, and not by way of an agreement to be paid nothing for responding to the objections to the Debtors' application to retain LBBS, but to resolve an objection that was based on a completely theoretical and hypothetic scenario.[3]

40.     Further, the UST's position is that LBBS should not be compensated for responding

---

[3] What is more, no actual conflict between TCG and LBBS ever arose.  While the Equity Members Conflicts Committee did file a status report late in the case, that was not in response to a conflict that had arisen between TCG and LBBS.  TCG as the Manager of the Debtors decided to ask the Court to enter simple dismissal orders and instructed LBBS to file a status report to that effect. As the Manager of the Debtors, that was a decision TCG had a right to make under ASIC's Operating Agreement. Further, TCG's decision was not of any benefit to it or to LBBS.  The Conflicts Committee, wrongly believing that simple dismissal orders would deprive the Court of jurisdiction to rule on final fee applications, filed its own status report.  That conflict, however, was between TCG and the Conflicts Committee and had nothing to do with LBBS prior, nominal representation of TCG.

to the two creditor filed objections to its employment, both of which were based on the absolutely false notion that TCG was somehow involved in not perfecting the noteholders' and bondholders' security interests and that LBBS was somehow involved in that as well.  According to the UST, LBBS was somehow responsible for creating those misimpressions as well.

41.     For the sake of argument, LBBS had calculated the reduction in fees that would result if the UST positions were correct, and came up with a reduction in the amount of $12,610.  The UST, however, calculated the appropriate reduction in fees to be $19,735.  As much as it pains LBBS to throw in the towel on this issue, it would pain LBBS even more if it were to have to go through an evidentiary hearing on the UST's objection and to put on evidence that although it was hired by Tom Cruise it was really performing pre-petition legal work for Cuba Gooding, Jr.  Thus, LBBS will fall on its sword on this issue.  The total amount requested as shown below includes a voluntary, albeit reluctant, reduction in the amount of $19,735 as requested by the UST.

42.     LBBS will further agree to deduct from its fee request the sum of $13,215 for the fees that are attributable to its first interim fee application.  The total amount of fees requested as shown below includes that voluntary reduction in the amount of $13,215 as well.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 75.80 | $41,690.00 | 62.90 | $33,110.00 | $74,800.00 |
| JGL | Partner | $450/hr. | 25.50 | $11,115.00 | 24.70 | $10,755.00 | $21,870.00 |
| AB | Assoc. | $300/hr. | 3.20 | $960.00 | 3.20 | $960.00 | $1,920.00 |
| MLG | Assoc. | $300/hr. | 1.60 | $480.00 | 3.10 | $930.00 | $1,410.00 |
| | | Subtotal | 106.10 | $54,245.00 | 93.90 | $45,755.00 | $100,000.00 |
| Less LBBS' voluntary reduction requested by the UST | | | | | | | ($19,735.00) |
| Subtotal | | | | | | | $80,265.00 |
| Less LBBS' voluntary reduction for first interim fee application fees | | | | | | | ($13,215.00) |
| Grant total | | | | | | | $67,050.00 |

Total amount requested:  **$67,050.00.**

Proposed allocation of Total Amount:  ASIC - $14,728.50 ; ASICIF - $52,321.50

### B190 - Other Contested Matters

43.     This billing category includes analysis and preparation of all other motions, opposition to motions and reply memoranda in support of motions.

44.     The services performed by LBBS under this billing category primarily related to an adversary proceeding filed by Roma, Adversary Complaint in Adv. Pro. No. 20-01266-EEB, including filing a motion to dismiss Roma's original complaint, filing a brief in opposition to Roma's motion for a temporary restraining order, and preparing for and attending the evidentiary hearing on Roma's motion for a temporary restraining order.

45.     The adversary proceeding commenced by Roma has substantially increased the legal fees in the ASIC case.  After Roma had filed its original complaint, it filed a motion for a temporary restraining order through which it sought an order from the Court for ASIC to immediately pay Roma over $335,000.  LBBS was required to prepare and file an extensive brief in opposition to the motion.  After filing its brief in opposition to Roma's motion for a TRO, LBBS prepared and filed a motion to dismiss rather than an answer.  Apparently as a result of reading ASIC's brief in opposition to its TRO motion, one minute after ASIC's motion to dismiss was filed, Roma filed an amended complaint in the adversary proceeding, adding additional allegations and claims and adding a new party.  LBBS then had to begin work on a motion to dismiss Roma's amended complaint.

46.     In the meantime, an evidentiary hearing was held on Roma's motion for a temporary restraining order on October 23, 2020.  Among other things, LBBS had to prepare witnesses for the hearing, prepare a cross-examination of Roma's witness, review and prepare objections to Roma's hearing exhibits, and prepare and rehearse an opening statement for the hearing.  The evidentiary hearing was a Zoom hearing and lasted three hours.  At the conclusion

of the presentation of Roma's case in chief, LBBS moved for, in effect, a directed verdict. That motion was granted, ASIC did not need to present any evidence, and Roma's motion for a temporary restraining order was denied. The Court also overruled Roma's objection to ASIC's motion to make a loan of up to $200,000 to High Desert Garden Holdings, which was heard along with Roma's TRO motion. ASIC has not yet filed its motion to dismiss Roma's amended complaint.

47.     It has also been suggested that LBBS is seeking over $40,000 in fees for opposing a motion for TRO. That suggestion is groundless. As shown in LBBS' detailed time entries related to the Roma's adversary proceeding, LBBS services included the following:  (i) researching possible arguments to dismiss Roma's adversary complaint, (ii) drafting a motion to dismiss, (iii) reviewing Roma's motion for a TRO, (iv) conducting research for the purpose of opposing the motion, (v) drafting a brief in opposition to the motion for a TRO, (v) preparing two declarations in opposition to the motion for a TRO, (vi) reviewing and analyzing background documents relevant to Roma's claims, (vii) conferences with representatives of TCG regarding the factual background relevant to TVO Hospitality's insurance claims, (viii) reviewing and analyzing Roma's amended complaint, (ix) conducting research regarding Roma's amended complaint, (x) preparing an outline of the motion to dismiss Roma's amended complaint, (xi) begin drafting a motion to dismiss Roma's amended complaint, (xii) preparing for cross examination of Roma's witnesses (xiii), preparing direct examinations of two witnesses for the TRO hearing, (xiv) preparing witnesses for direct and cross examination, (xv) reviewing Roma's hearing exhibits and analyzing grounds for objections, (xvi) preparing an opening statement for the TRO hearing, (xvii) other activities in preparation for the TRO hearing, and (xviii) attending the TRO hearing.

48.     It has further been suggested that LBBS charged too much for what turned out to

be a three-hour evidentiary hearing. That argument fails to appreciate that the only reason why the hearing did not go longer is because, at the close of Roma's evidence, LBBS moved for a directed verdict on behalf of ASIC. The motion was granted, and the hearing was over. Still, LBBS had to prepare for a full-blown hearing, which would have included putting on ASIC's case, conducting direct and re-direct examination of ASIC's witnesses, and an anticipated closing argument. LBBS should not be penalized for successfully moving the Court to deny Roma's motion at the close of its case.

49.     Finally, LBBS' services should be evaluated in light of what was at stake in the Roma adversary proceeding: over $335,000 in ASIC's debtor in possession account. Roma had argued those funds belonged to High Desert Garden Holdings and had to be immediately transferred to its bank account. That was more than half of the cash in ASIC's estate. Thus, ASIC had no option but to vigorously defend against Roma's adversary proceeding and motion for a TRO. That said, through emails dated October 10 and October 20, 2020, LBBS twice asked Roma to dismiss its adversary proceeding and to withdraw its objection to ASIC's motion to make a loan of up to $200,000 to High Desert Garden Holdings. Roma refused to do either. Thus, LBBS did everything it could to prevent ASIC from having to incur legal fees in the litigation that Roma commenced and eventually dismissed.

50.     LBBS recites this history of the litigation commenced by Roma not to suggest that Roma did not have a right to seek enforcement of what it perceives as its legal rights in the forum. Of course it did. LBBS has recited this history to explain to the Court and to parties in interest why LBBS' fees in the ASIC/Roma litigation were higher than LBBS would have liked them to be.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 38.10 | $20,955.00 | 2.40 | $1,320.00 | $22,275.00 |
| AB | Associate | $300/hr. | 87.30 | $26,190.00 | 2.50 | $750.00 | $26,940.00 |
| | | **Subtotal** | **125.40** | **$47,145.00** | **4.90** | **$2,070.00** | **$49,215.00** |

Proposed allocation of Total Amount:  ASIC - $47,145.00; ASICIF - $2,070.00

### B210 - Business Operations

51.    This billing category includes addressing business issues unrelated to these Chapter 11 proceedings.

52.    As the description of this category implies, the services performed by LBBS under this billing category relate to the operation of the Debtors' businesses and fulfilment of their responsibilities as managers of their respective non-debtor investment entities.  These services include, but are not limited to, governance requirements and obligations, investor relations, financing transactions related to non-debtor investment entities, management of non-bankruptcy leasehold interests, and related matters.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 9.30 | $5,115.00 | 6.60 | $3,630.00 | $8,745.00 |
| JGL | Partner | $450/hr. | 49.10 | $22,095.00 | 51.90 | $23,355.00 | $45,450.00 |
| | | **Subtotal** | **58.40** | **$27,210.00** | **58.50** | **$26,985.00** | **$54,195.00** |

Proposed allocation of Total Amount:  ASIC - $5,419.50; ASICIF - $48,775.50

### B230 - Financing/Cash Collections

53.    This billing category includes matters under 11 U.S.C. §§ 361, 363 and 364 including cash collateral, and secured claim, and loan document analysis.  It also includes activities relating to the refinancing of loan obligations of wholly owned operating subsidiaries.

54.    The services performed by LBBS under this billing category included seeking Court approval, pursuant to 11 U.S.C. § 363 to make cash infusions into or loans to entities in which it

had invested before the Petition Date and are included in the Debtors' business portfolios.

55. LBBS has filed, prosecuted, and prevailed on six motions filed under 11 U.S.C. § 363 of the Bankruptcy Code. Four of the motions involved responding to four capital calls made by Longford Capital II, LP in the amount of $40,000 each. One of the motions involved making a $175,000 cash infusion into one of ASICIF's wholly-owned subsidiaries, ELP MC Venture, LLC. The other two motions involved making loans, one by ASIC in an amount up to $200,000 to a partially-owned subsidiary, High Desert Garden Holdings, LLC, and the other by ASICIF in the amount of $200,000 to an entity in which it has invested, Thorin Resources, LLC.

56. All of these motions were necessary to preserve and protect the value of the Debtors' assets. Some were objected to by various parties in interest, but all of those objections were resolved, and all of the motions were in due course granted by the Court.

57. Preparing, filing, serving, prosecuting, and resolving any objections to these 11 U.S.C. § 363 motions required a considerable amount of time. Of the 3,662 individual time entries made in both the ASIC and ASICIF client-matter numbers 285, or 7.8 percent, of them were devoted to activities related to the section 363 motions. All of that time was required to be expended as a result of the business needs of the Debtors and the Court's directive that all such transactions be noticed out to creditors.

58. Also included in this billing category are services that related primarily to the negotiation, drafting, and closing of financing and loan extension transactions for ELP MC Venture, LLC in February and March of 2021.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 15.80 | $8,690.00 | 58.90 | $32,395.00 | $41,085.00 |
| JGL | Partner | $450/hr. | 38.80 | $17,460.00 | 25.70 | $11,565.00 | $29,025.00 |
| AB | Assoc. | $300/hr. | 0.60 | $180.00 | 0.40 | $120.00 | $300.00 |
| | | Subtotal | 55.20 | $26,330.00 | 85.00 | $44,080.00 | $70,410.00 |

Proposed allocation of Total Amount:  ASIC - $12,695.00; ASICIF - $57,715.00

### B260 – Board of Directors Matters

59.     Because the Debtors are both limited liability companies, they do not have boards of directors *per se*.  The meeting of the members of ASIC, however, are very similar to a board of directors meeting.  Thus, this billing category consists primarily of matters relating to the members of ASIC, including preparing for and attending members meetings.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 11.30 | $6,215.00 | 0.00 | $0.00 | $6,215.00 |
| JGL | Partner | $450/hr. | 16.00 | $7,200.00 | 1.80 | $810.00 | $8,010.00 |
| | | Subtotal | 27.30 | $13,415.00 | 1.80 | $ 810.00 | $14,225.00 |

Proposed allocation of Total Amount:  ASIC - $14,225.00 ASICIF - $0.00

### B270 – Regulatory and Compliance Matters

60.     This Billing category primarily relates to services performed in connection with the ongoing SEC investigation of the Debtors and other entities and persons.

61.     The services performed by LBBS under this billing category include responding to inquiries from the SEC and counsel for other subjects of the SEC's investigation.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 2.60 | $1,430.00 | 1.70 | $935.00 | $2,365.00 |
| JGL | Partner | $450/hr. | 0.60 | $270.00 | 0.60 | $270.00 | $540.00 |
| BRH | Assoc. | $300/hr. | 5.30 | $1,590.00 | 3.20 | $960.00 | $2,550.00 |
| SH4 | Partner | $450/hr. | 0.20 | $90.00 | 0.20 | $90.00 | $180.00 |
| | | Subtotal | 8.70 | $3,380.00 | 5.70 | $2,255.00 | $5,635.00 |

Proposed allocation of Total Amount:  ASIC - $3,380.00; ASICIF - $2,255.00

## B310 - Claims Administration and Objections

62.    This Billing category includes specific claim inquiries; bar date motions; analyses, objections and allowances of claims.

63.    The services performed by LBBS under this billing category includes responding to creditor inquiries regarding their scheduled claims, preparing and filing *ex parte* motions and proposed orders extending the SEC's deadline for filing a proof of claim, and reviewing and analyzing selected proofs of claim.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 1.10 | $605.00 | 0.50 | $275.00 | $880.00 |
| | | Subtotal | $ 1.10 | $ 605.00 | 0.50 | $ 275.00 | $ 880.00 |

Proposed allocation of Total Amount:  ASIC - $880.00; ASICIF - $0.00

## B410 – General Bankruptcy Advice/Opinions

64.    The services rendered by LBBS under this billing category related primarily to the dismissal of these cases so as to allow for the creation and perfection of security interests in favor of the noteholders of ASIC and the bondholders of ASICIF under the protections afforded by forbearance agreements that were to be executed by the noteholders and bondholders.

65.    The concept of a potential structured dismissal of these cases arose during a conference call between counsel for and representatives of the Debtors and Accelerated Wealth on August 10, 2020.[4]  Grave concerns were expressed by Accelerated Wealth on behalf of the noteholders of ASIC and the bondholders of ASICIF, most of whom are or were clients of Accelerated Wealth, that if a Chapter 11 trustee were to be appointed or these cases were to be converted to Chapter 7, a trustee might seek to avoid the noteholders and bondholders security

---

[4]  As used in herein, the term "Accelerated Wealth" refers to Accelerated Wealth, LLC and Accelerated Wealth Advisors, LLC, both individually and collectively.

interests for lack of attachment, lack of perfection, or both. Because the positions of the noteholders and bondholders could not be improved while the Debtors remained in Chapter 11, LBBS proposed revisiting the idea of having forbearance agreements executed between ASIC and its noteholders, and ASICIF and its bondholders, so as to facilitate a dismissal of the bankruptcy cases to allow improvement of the security interests. Prior to the filing of their petitions for relief the Debtors had sought to avoid having to seek the protections afforded by the Bankruptcy Code by asking all of the noteholders and bondholders to execute forbearance agreements, but too many either failed or refused to do so. Thus, LBBS proposed that if, after these cases had been commenced, all or a sufficient number of noteholder and bondholders were to sign forbearance agreements, the Debtors would no longer need the protection of the automatic stay under 11 U.S.C. § 362, and could therefore move for dismissal of these cases. After the cases were dismissed, ASIC and its noteholders, and ASICIF and its bondholders, could execute new security agreements that would fully and adequately describe their collateral and the newly created security interests could be perfected through filing of UCC-1 financing statements in the appropriate jurisdictions. ASIC and ASICIF would also agree to not to file Chapter 11 petitions again for at least 91 days after the UCC-1 financing statements were filed so as to protect them from avoidance through later filed preference actions.

66.     After a general agreement had been reached during that conference call regarding the concept of the structured dismissal of these cases, LBBS then spearheaded the efforts to draft the new forbearance agreements and security agreements on which the dismissals would be based, even though those efforts, if successful, would put LBBS out of a job – that is, its job as bankruptcy counsel for the Debtors. The first draft of the new form of forbearance agreement was circulated on August 20, 2020, only 10 days after the conference call. The first draft of the new security

agreement was circulated thereafter on September 3, 2020.

67.     Unfortunately, the process of negotiating and finalizing the forbearance agreements and security agreements on which structured dismissals could be based took much longer than had been hoped.  LBBS had hoped that the structured dismissal process would have been completed in October 2020 and would have provided the Debtors with the basic protections of Chapter 11 without all of the attendant fees and expenses and also would have provided the noteholders and bondholders with unassailable, unavoidable security interests.   Due to the actions of other interested parties, however, the process took much longer than anticipated with the resulting effect that more legal fees were incurred by the Debtors, even though one of the goals of the process was to avoid having the Debtors incur legal fees.  Indeed, of the 3,662 individual time entries made in both the ASIC and ASICIF client-matter numbers 805, or roughly 22 percent, of them include the words "forbearance" or "security."   In terms of dollars, task code B410 – General Bankruptcy Advice/Opinion – accounts for $248,055.00 of LBBS' fees.  The vast majority of those fees  relate to the Debtors' efforts to seek a structured dismissal of these cases through the execution of new forbearance agreements and post-dismissal security agreements, the preparation and prosecution of their motion for dismissal, and post-dismissal activities related to the execution of the new security agreements and the perfection thereof.

68.     On a more granular level, billing category B410, in addition to encompassing matters that do not otherwise neatly fall within another billing category, includes services relating to a wide variety of activities, including the following:   (i) general bankruptcy advice and related activities, (ii) analysis of the effect on bondholders and noteholders if their claims are not secured, (iii) a structured dismissal of the cases in exchange for forbearance agreements from investors, (iv) legal research, including research regarding the creation and perfection of security interests and

the terms and conditions under which courts have granted structured dismissals, (v) reviewing and analyzing issues pertaining to forbearance agreements and drafting and redrafting same, (vi) reviewing and analyzing issues pertaining to security agreements with investors and drafting and redrafting same, (vii) reviewing and analyzing issues pertaining to the perfection of security interests and the contents of UCC-1 financing statements, (viii) reviewing and analyzing of the proposed terms and conditions of a structured dismissal, (ix) communications to and from parties in interest regarding a potential structured dismissal, the forbearance agreements, and the security agreements, and (x) miscellaneous tasks and activities not covered above.[5]

69.    With respect to the first of the foregoing groupings, general bankruptcy advice and related activities, Services performed in this grouping included such general bankruptcy advice as procedures for dealing with debtor in possession accounts, dealing with accounts held by sub-advisors to TCG, general contract management, analysis of issues pertaining to payment of advisory fees, communications with noteholders and bondholders, communications and meeting with members, investment entity capital call financing documents, and ordinary course of business transactions.

70.    As to the second group, analysis of the effect on bondholders and noteholders if their claims are not secured.  Even before discussions regarding a potential structured dismissal began, in response to calls from creditors regarding whether they were secured, research and analysis were performed on that issue, including what effect it might have on bondholders and noteholders.  The secured status of noteholders and bondholders and the scope and avoidability of their security interests also affected whether the Debtors had any cash collateral issues pertaining

---

[5] For a breakdown of these ten activity groupings by hours spent and fees generated for the period from June 14, 2020 through October 31, 2020, see "Exhibit A" to Response to Objections to First Interim Fee Application Lewis Brisbois Bisgaard & Smith LLP for Compensation And Reimbursement of Expenses (Dkt. No. 319-1), which is incorporated herein by reference.

to their deposit accounts. The noteholders and bondholders who called had apparently been told by someone that they were not secured, and they were very upset about that and wanted answers. Regardless of whether it had any economic effect on them, it was certainly having an adverse psychological effect. As counsel for several bondholders put it, there were "grave concerns" that the bondholders were not secured. They had always been told that they were and had always believed they were. Now someone was telling them they weren't, and they wanted what they had bargained for. It was becoming a very big issue. Explaining to them and their counsel that the noteholders and bondholders held the vast majority of the claims in both estates did not seem to matter. The noteholders and bondholders wanted what they had been told they were getting by the Debtors in their offering documents.

71.     The third grouping – a potential structured dismissal of the cases in exchange for forbearance agreements from investors – relates to activities before the drafting of the forbearance agreements and security agreements even began. What had to be addressed first was the threshold issue of whether a structured dismissal made sense and whether it provided an appropriate vehicle for addressing the concerns of, not only the bondholders and noteholders, but also Accelerated Wealth, which was the investment advisor for the vast majority of them. Without Accelerated Wealth's approval and endorsement, exiting bankruptcy through a structured dismissal would be dead in the water. And so, the merits of whether to seek a structured dismissal in exchange for forbearance agreements had to be thoroughly analyzed and vetted not only with management of the Debtors but also Accelerated Wealth and its counsel.

72.     The fourth grouping of services relates to legal research, including research regarding the creation and perfection of security interests and the terms and conditions under which courts have granted structured dismissals. As LBBS began digging in to what the Debtors' prior

counsel had done, and not done, in connection with creating and perfecting security interests on behalf of the bondholders and noteholders, it became clear that errors had been made. If the bankruptcy cases were to be dismissed so as to enable the Debtors to right those wrongs, it was important to make sure that the "redo" was done correctly under Article 9 of the UCC, under both Colorado law and Wyoming law. Further, as structured dismissals are not the typical way in which Chapter 11 cases are resolved, LBBS had to confirm the law in this area, particular as it may have evolved since the Supreme Court's decision in *Czyzewski v. Jevic Holding Corp.* in 2017. Finally, since the Debtors were involved in an ongoing SEC investigation, LBBS had to perform research and analysis on whether dismissing the bankruptcy cases might expose the Debtors to a being placed into an SEC receivership.

73.     Drafting, redrafting, and re-redrafting both the proposed forbearance agreements and the security agreements, which includes both groups five and six above, was not an event, it was a process, a long and, at times, a  tedious and frustrating process.  (Both the forbearance agreements and the security agreements are included here because many of the time entries relate to both and cannot be easily broken out.)  After the initial drafts were finished, they were reviewed by management of the Debtors, and then redrafted based on their comments and requested changes. Initially, the revised drafts were sent to bankruptcy counsel for Accelerated Wealth for review and comment whose numerous suggested changes were submitted over several months and were reviewed, shared with TCG, and then included or not included in the drafts.   Redrafts were then circulated internally before being sent back to counsel for Accelerated Wealth.  Securities counsel for Accelerated Wealth then became involved in the process and made his own comments and suggested changes whose suggested changes were reviewed, shared with TCG, and then included or not included in redrafts.  Representatives of Accelerated Wealth then joined in directly on the

protracted drafting and redrafting process, typically sharing their comments and suggested changes directly with TCG which passed them on to LBBS.   TGC would often, after negotiating with Accelerated Wealth directly, request additional changes to the then current drafts of the forbearance agreements and security agreements. Those changes would have to be made and then recirculated to Accelerated Wealth for its review.  In a number of instances, after previously being instructed to insert a provision in one of the documents, LBBS was later instructed to take the provision out.  It was a constant process of accretion followed by deletion, followed by something else.  For example, after weeks of negotiations counsel for Accelerated Wealth attempted to circumvent negotiations by submitting an entirely new daft to the security agreement only hours before a Debtor's member's meeting which was scheduled for the purpose of reviewing and approving the negotiated drafts so that they could be submitted to the noteholders and bondholders for consideration.

74.     In sum, Accelerated Wealth was an active participant in the entire process.  The need to respond to a steady stream of complaints, ideas, requests, comments, and redlined edits from Accelerated Wealth over a period of several months significantly increased the fees incurred by the Debtors on this project.  Indeed, for the period from August through October, 2020 alone, LBBS' invoices contain no fewer than 85 separate references to "Accelerated Wealth" and 62 references to its counsel.   That is not to say that Accelerated Wealth was not a welcome participant in the process.   The Debtors far preferred to deal with Accelerated Wealth as a *de facto* representative of the noteholders and bondholders than to deal separately with over 240 individual investors.  The point that needs to be made and appreciated is that the Debtors were not at liberty to control the costs of the negotiation, drafting, and re-drafting of the forbearance agreements and the security agreements by, for example, excluding Accelerated Wealth and its counsel from the

process or by simply ignoring the input they wished to provide.

75.    TCG also was in communication directly with representatives of the Noteholders'
Committee which had its own suggested changes.  In due course, the Bondholders' Committee
was asked to provide its own suggested changes.  Redlined changes were eventually received from
the Bondholders' Committee, but too late to be considered before the forbearance agreements and
security agreements had been finalized and distributed for signature.

76.    Mr. Lubitz, one of LBBS' corporate partners, spearheaded the drafting, redrafting,
and re-redrafting process.  Mr. Parks played a far more limited role and proposed suggested edits
to the forbearance agreements and security agreements, including suggested edits based on
bankruptcy law considerations.  Granted, the entire process took a considerable amount of time,
but with potentially as over 240 noteholders and bondholders and, hence, cooks in the kitchen, it
was unavoidable.  Because of the complex issues involved, the countless interests to be considered,
and the fact that the outcome of the bankruptcy case depended, in large part, on the negotiations
related to the forbearance agreement and security agreement, LBBS did not have the option of
telling the Debtors, bankruptcy counsel and securities counsel for Accelerated Wealth, and
Accelerated Wealth that LBBS was done with its drafting and it was not going to make any further
changes to the documents.  LBBS, after all, participated in this process as an agent, not a principal.
It was not up to LBBS to say when the negotiating and drafting process had reached its completion.
That was up to the Debtors and other parties in interest.

77.    With respect to the seventh group of services, in addition to performing and
reviewing legal research regarding the perfection of security interest, additional time was devoted
to other aspects of perfection, including the proper language to include in UCC-1 financing
statements.

78.     In addition to performing and reviewing legal research regarding structured dismissals of Chapter 11 cases, LBBS performed other services including sending and receiving internal emails on the subject, sending and receiving emails with TCG regarding structured dismissals, and preparing a memorandum regard the merits of a structured dismissal.  These services are including in the eighth grouping of activities.

79.     As for the ninth group of services under Billing Category B410, because of the extensive coordination that was required between LBBS attorneys as well as with representatives of TCG, bankruptcy counsel for Accelerated Wealth, Accelerated Wealth, representatives of the Noteholders' Committee, and counsel for the Bondholders' Committee, the structured dismissal/forbearance agreement/security agreement process required extensive communications, including numerous telephone conferences and even more email correspondence.

80.     Finally, there were miscellaneous tasks and activities not covered above, all of which are included in the tenth group of activities.

81.     In addition to the foregoing, all of LBBS' services in connection with the motion for dismissal were tracked under billing category B410.  The activities associated with the motion for dismissal included performing legal research on cases decided under 11 U.S.C. §§ 1112(b)(4) and 305(a), as well as cases in which courts have revived or extended the automatic stay after it had terminated.  LBBS also performed additional research regarding structured dismissals.  Other activities tracked under billing code B410 included the following: (i) the initial drafting of the motion for dismissal, (ii) receiving and responding to pre-filing requests for changes from counsel for Accelerated Wealth and counsel for the Bondholders' Committee, (iii) finalizing the motion for dismissal and related papers, (iv) responding to post-filing comments regarding the motion for dismissal and negotiating proposed resolution of potential objections, (v) participating in the

drafting and execution of a resolution and amended resolution by unanimous consent of the members of ASIC to address issues that would otherwise have been grounds for objections to the motion for dismissal, (vi) reviewing and responding to objections that were actually filed to the motion for dismissal, (vii) preparing for and attending the hearing on the motion for dismissal, and (viii) preparing for and attending the status conference with the Court regarding whether there should be any terms and conditions attached to the dismissals and whether a fee examiner should be appointed.

82. Finally, certain post-dismissal services were billed under billing category B410, including services performed in connection with the execution of the new security agreements, the finalization and filing of the UCC-1 financing statements, and other case closing matters.

| Timekeeper | Title | Rate | ASIC Hours | ASIC Amount | ASICIF Hours | ASICIF Amount | Total Amount |
|---|---|---|---|---|---|---|---|
| JCP | Partner | $550/hr. | 134.10 | $73,755.00 | 152.90 | $84,095.00 | $157,850.00 |
| JGL | Partner | $450/hr. | 84.80 | $38,160.00 | 86.70 | $39,015.00 | $77,175.00 |
| RSL | Partner | $450/hr. | 1.50 | $675.00 | 1.50 | $675.00 | $1,350.00 |
| AB | Assoc. | $300/hr. | 1.90 | $855.00 | 1.90 | $855.00 | $1,710.00 |
| BRD | Assoc. | $300/hr. | 15.00 | $2,540.00 | 15.00 | $2,540.00 | $5,080.00 |
| BRH | Assoc. | $300/hr. | 2.00 | $600.00 | 4.10 | $1,230.00 | $1,830.00 |
| BN | Assoc. | $300/hr. | 5.10 | $1,530.00 | 5.10 | $1,530.00 | $3,060.00 |
|  |  | **Subtotal** | **244.40** | **$118,115.00** | **267.20** | **$129,940.00** | **$248,055.00** |

Proposed allocation of Total Amount:  ASIC - $24,805.50; ASICIF - $223,249.50

**Recapitulation of All Services by Timekeeper**

| Timekeeper | Hours | Fees |
|---|---|---|
| JCP | 884.90 | $462,275.00 |
| JGL | 520.80 | $232,290.00 |
| RSL | 3.00 | $1,350.00 |
| SH | 0.40 | $180.00 |
| AB | 139.70 | $41,490.00 |
| BRD | 31.30 | $5,242.50 |
| MLG | 29.50 | $8,700.00 |
| BRH | 14.60 | $4,380.00 |
| MC | 1.50 | $187.50 |
| MD | 1.90 | $237.50 |
| BN | 10.20 | $3,060.00 |
| Voluntary Fee Reduction | | ($32,950.00) |
| **Total** | **1637.80** | **$726,442.50**[6] |

**Recapitulation of All Services by Billing Category**

| Category Number | Category Description | Hours | Fees |
|---|---|---|---|
| B110 | Case Administration | 346.80 | $171,025.00 |
| B120 | Asset Analysis and Recovery | 8.30 | $4,115.00 |
| B130 | Asset Disposition | 2.80 | $902.50 |
| B140 | Relief from stay/Adequate Protection Proceedings | 58.00 | $25,110.00 |
| B150 | Meeting of and Communications with Creditors | 29.30 | $15,625.00 |
| B160 | Fee/Employment Applications[7] | 200.00 | $67,050.00 |
| B190 | Other Contested Matters | 130.30 | $49,215.00 |
| B210 | Business Operations | 116.90 | $54,195.00 |
| B230 | Financing/Cash Collections | 140.20 | $70,410.00 |
| B260 | Board of Directors Matters | 29.10 | $14,225.00 |
| B270 | Regulatory and Compliance Matters | 14.40 | $5,635.00 |
| B310 | Claims Administration and Objections | 1.60 | $880.00 |
| B410 | General Bankruptcy Advice/Opinions | 511.60 | $248,055.00 |
| B888 | No Charge | 48.50 | $0.00 |
| | **Total** | **1637.80** | **$726,442.50** |

Proposed allocation of Total Amount:  ASIC - $170,828.50; ASICIF - $555,614.00

---

[6] Total amount of fees requests includes a reduction in the amount of $32,950 under billing category B160.

[7] Total amount of fees requested includes a reduction in the amount of $32,950 for this billing categogy.

## V.      EXPENSES INCURRED

83.      The LBBS invoices also include detailed information regarding monies disbursed on behalf of the Debtors by LBBS during the Application Period.   Those disbursements are summarized as follows:

### ASIC

| E101 – Copying | $359.85 |
|---|---|
| E108 – Postage | $454.40 |
| E112 – Court Fees | $62.00 |
| E123 – Other | $954.80 |
| **Total** | **$1,831.05** |

### ASICIF

| E101 – Copying | $2,202.95 |
|---|---|
| E108 – Postage | $867.74 |
| E112 – Court Fees | $122.00 |
| E123 – Other | $3,859.80 |
| **Total** | **$7,052.49** |

## VI.      THE APPLICABLE LEGAL STANDARDS

84.      Pursuant to 11 U.S.C. § 330(a)(1), a court may award a professional person employed under section 327 "reasonable compensation for actual, necessary services rendered" and "reimbursement ford actual, necessary expenses."  Section 330(a)(3) lists a number of factors that a court must be consider in determining the amount of reasonable compensation:

In determining the amount of reasonable compensation to be awarded ..., the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including-

(A)      the time spent on such services;

(B)      the rates charged for such services;

(C)      whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

     (D)     whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

     (E)     with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

     (F)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

85.    In connection with section 330(a)(1)(C), fees for professional services rendered may be awarded if they were either necessary to the administration of the bankruptcy estate or reasonably likely to benefit the bankruptcy estate at the time the services were rendered. *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner*), 783 F.3d 266, 276 (5th Cir. 2015); *see also In re Morreale,* No. 13-27310 TBM, 2019 Bankr. LEXIS 2071, at *15 (Bankr. D. Colo. July 3, 2019). Section 330(a)(1) does not require that the services result in an actual monetary or material benefit to the estate but only that applicant demonstrate the services were "reasonably likely" to benefit the estate at the time the services were rendered. *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co. (In re Mednet)*, 251 B.R. 103, 108 (B.A.P. 9th Cir. 2000).

86.    Courts in this Circuit apply an "adjusted lodestar" approach to determine the reasonableness of attorney fees. *In re Tollefson*, 2015 WL 3897533 (Bankr. D. Colo., May 13, 2015) (*citing Market Center East Retail Property, Inc. v. Lurie (In re Market Center East Retail Property, Inc.),* 730 F. 3d 1239, 1246 (10th Cir. 2013)). Under the adjusted loadstar approach, the court first determines the lodestar amount of a fee, and then adjusts the fee in accordance with the circumstances of the case. *In re Potts*, No. 11-22624 HRT, 2013 Bankr. LEXIS 4164, at *29 (Bankr. D. Colo. Oct. 3, 2013) (*citing Robinson v. City of Edmond*, 160 F.3d 1275 (10th Cir.1998)).

87.    The circumstances of a case are evaluated using the 12 factors enumerated in

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), adopted by the Tenth Circuit in *First Nat'l Bank of Lea County v. Niccum (In re Permian Anchor Servs., Inc.)*, 649 F.2d 763, 768 (10th Cir. 1981). The *Johnson* factors are as follows: (1) the time and labor required; (2) novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Market Center*, 730 F. 3d at 1251. A court, therefore, must consider both the Section 330(a)(3) factors and the *Johnson* factors-- and only those factors-- in evaluating the reasonableness of a bankruptcy fee application. *In re Tollefson*, 2015 WL 3897533 at *10 (*citing Market Center*, 730 F.3d at 1249; *First Nat'l Bank,* 649 F.2d at 768).

88.    "The burden is on [the applicant] to establish that they are entitled to the compensation as requested. However, once the prima facia showing is made by an applicant, any objection raised must be substantiated by evidence showing that the applicant has requested an unreasonable amount, whether it be excessive hourly rates/hours or duplicative/unnecessary work. General dissatisfaction or a disagreement over business judgment will not suffice." *SGE Mortg. Funding Corp. v. Comm. of Inv'rs Holding Unsecured Claims (In re SGE Mortg. Funding Corp.)*, 301 B.R. 915, 917 (Bankr. M.D. Ga. 2003) (citations omitted). A party objecting to the amount of time spent on services has the burden of proving that too much time was spent and must carry the burden of explaining specifically what part of the compensation requested is unreasonable. *In re Bass Energy, Inc.*, No. 00-10052-11, 2000 Bankr. LEXIS 2100, at *7-8 (Bankr. N.D. Tex. Aug. 22, 2000). "A party objecting to a fee application may not do so based on the general proposition that

the fee sought is simply too much. It should go beyond this assertion to articulate a reason why and, if necessary, present evidence in support thereof… The objector must, at some point, identify any allegedly improper, insufficient, or excessive entries and direct the court's attention to them." *In re Hunt's Health Care*, 161 B.R. 971, 982 (Bankr. N.D. Ind. 1993)

### A.      Application of the Section 330(a) Standards

### 1.      The time spent

89.      The summaries included in Section V above, together with the exhibits attached hereto, detail the time nature and extent of the professional services LBBS rendered for the benefit of the Debtors during the Application Period.  The total number of hours expended, 1,637.80, demonstrates that LBBS has assisted the Debtors through all aspects of their bankruptcy cases. During Application period, LBBS' hours have averaged 148.89 hours per month for both the Debtors' cases.  Given the size and complexity of these cases, including the total dollar values of assets and total dollar amounts of scheduled claims, the number of motions that have had to be filed and were objected to, the litigation initiated against the Debtors, and the efforts that were undertaken to explore alternatives to reorganizing the Debtors of under Chapter 11 of the Bankruptcy Code, the time spent by LBBS on these cases was reasonable.

90.      As a result primarily of LBBS' work on a potential structured dismissal of these cases, defending against the litigation commenced by Roma, and filing and prosecuting motions under section 363, LBBS' billed hours in these cases increased from a mere 71.20 hours in July, to 156.8 hours in August, to 306.50 hours in September, and to 308.00 hours in October. Thereafter, LBBS' monthly hours returned to more "normal" levels.

91.      Specifically, after the very busy months of September and October 2020, LBBS' monthly hour totals for both matters were as follows:  November – 143.00 hours; December –

127.00 hours; January – 152.40 hours; February – 119.90 hours; March – 94.00 hours; and April/May (combined) 100.70 hours. This data shows that the unusually high hours in September (306.50 hours) and October (308.00 hours) of 2020 were the result of the work that needed to be done, not by any efficiency or over billing on the part of LBBS.

92.     LBBS' invoices to the Debtors together contain a total of 3,662 separate detailed time entries, which include the date the work was performed, the individual who performed the work, how much time was spent on each task in tenth of an hour increments, the total fee for each task, and a detailed description of the work performed.

93.     Of the 3,662 time entries, 1,126 are for .10 hours or a total of 31 percent of all time entries. Further, 933 of the time entries are for .20 hours, 426 are for .30 hours, and 262 are for .40 hours. Thus, a full 75 percent of LBBS' detailed time entries are for .40 hours or less. This data shows that LBBS has been very efficient and economical in its provision of legal services to the Debtors. LBBS has not been "churning" these files. It has not been "running up" its bills. It has not been "platooning" these cases with a cadre of lawyers. To the contrary, the vast majority of LBBS work on these cases has been performed by only two of its lawyers, with other lawyers filling in as needed on discrete projects and on an *ad hoc* basis.

94.     In short, the amount of time spent by LBBS from the Petition Date through the date the orders of dismissal were entered was reasonable.

## 2.     The rates charged

95.     The hourly rates for attorneys and other timekeepers approved by the Court in its orders granting the Debtors' applications to employ LBBS were as follows: Partners - $550/hr.; Associates - $375/hr.; Paralegals and Law Clerks - $175/hr. After applying the foregoing hourly rates to the number of hours worked by LBBS attorneys and other timekeepers through the first

four and one half months of the cases, LBBS decided, in the exercise of its billing judgment, to downwardly adjust its hourly rates as follows:  Partners other than Mr. Parks - $450/hr. (a reduction of $100/hr.); Associates - $300/hr. (a reduction of $75/hr.);   and Paralegals and Law Clerks - $125/hr. (a reduction of $50/hr.).   Mr. Parks' hourly rate remained at $550/hr.  This voluntary reduction in LBBS' hourly billing rates saved both Debtors nearly $70,000 in legal fees.

96.     The original hourly rates for LBBS' attorneys and other timekeepers reflect billing rates that are at or below the rates the firm typically charges to clients in other bankruptcy and complex commercial cases.  For example, Mr. Parks' hourly rates in two other matters he has recently worked on range from $645/hr. to $750/hr.  His hourly rate in these cases has been $550/hr. Also, the firm has recently charged $450/hr. for Mr. Biller's work in two other matters.  Mr. Biller's work in these cases has been charged at $300/hr.  Finally, Mr. Lubitz's current hourly rate for corporate clients in Denver is anywhere from $425/hr. to $495/hr.  Thus, the downwardly adjusted hourly rates set forth above result in rates that are well below the rates the firm typically charges in matters involving comparable complexity.

97.     Finally, LBBS has compared its hourly rates in these matters with the hourly rates charged by other large firms for Chapter 11 work performed in this judicial district.  LBBS has found that the hourly rates of its professionals are at or below the prevailing "market" hourly rates.

### 3.     The services were necessary or beneficial toward completion of the case

98.      As previously noted, fees for professional services rendered may be awarded under 11 U.S.C. § 330 if they were either necessary to the administration of the bankruptcy estate or reasonably likely to benefit the bankruptcy estate at the time the services were rendered. Even under the more rigorous "necessary to the administration of the bankruptcy estate" criterion, the services rendered by LBBS to the Debtors' estates pass muster under the section 330 standards.

99.     LBBS (at the Debtors' request, of course) did not file a single motion that was not necessary to the administration of the bankruptcy estates.  This was certainly true of the motions filed pursuant to section 363 of the Bankruptcy Code so that the Debtors could infuse cash or make a loan to a struggling operating subsidiary or to respond to a cash call from a fund in which one of them had invested.  Moreover, all of those motions were granted.  It was also true of the two motions LBBS filed to extend the Debtors' exclusivity periods under section 1121 of the Bankruptcy Code.  Although as early as August 2020, the Debtors' "plan" was to exit Chapter 11 through a structured dismissal, if a sufficient number of noteholders and bondholders had not agreed to sign forbearance agreements, that exit strategy would have been abandoned and the Debtors would have begun formulating plans of reorganization.  To avoid the prospect of competing plans being filed, the Debtors had to preserve their exclusive right to propose plans of reorganization and to solicit acceptances thereon.  Finally, the Debtors' motion for voluntary dismissal of their cases was necessary to the administration of their bankruptcy estates.  There are only three ways to exit a Chapter 11 case:  conversion, dismissal, or confirmation of a plan.  The first was not an option and the last of these would have been pursued only as a second choice. Thus, moving to dismiss these cases was a necessary part of their administration.

100.     LBBS' services in opposing motions and other litigation filed by other parties was also necessary to the administration of the Debtors' estates.  Motions for relief from stay are routinely opposed by debtors in Chapter 11 cases, and seeking to preserve the breathing spell afforded by the automatic stay of section 362 is a necessary part of the administration of any Chapter 11 estate.

101.     The services performed by LBBS in connection with the negotiation, drafting, and redrafting of the forbearance agreements, the security agreements, and the UCC-1 financing

statements were also necessary to the administration of the bankruptcy estate.  Exiting Chapter 11 through a motion for voluntary dismissal would not have been possible without the protections afforded by the forbearance agreements.  Conversely, the noteholders and bondholders would not have been incentivized to sign forbearance agreements and to agree to the dismissal of these cases without getting something in return.  The offer to execute new security agreements and to perfect the security interests created thereunder provided such an incentive.  Moreover, to extent that the Debtors' failure to provide their investors with valid, enforceable, and perfected security interests might give rise to some kind of liability under the securities laws, the creation of new security interests and the perfection thereof was necessary to avoid battles with the SEC over whether it had a claim against the Debtors and whether any claim the SEC might have was exempted from discharge under section 1141(d)(6) of the Bankruptcy Code.

102.    Finally, the services performed by LBBS in connection with the administration of the Debtors' estates were necessary.  Those services included assisting the Debtors with the preparation of their statements of financial affairs, schedules of assets and liabilities, and filings required by Rules 1007 and 2015.3, and assisting in the preparation of amendments to all of those filings.  LBBS' services also included preparing the Debtors for their initial debtor examination with the UST and assisting them during the examination, preparing the Debtors for not just one but two section 341 meetings with creditors and assisting the Debtors during those meetings, assisting the Debtors with their Monthly Operating Reports, and responding to Rule 2004 examinations and document requests.  All of these activities were necessary to the administration of the Debtors' bankruptcy estates.

103.    In short, LBBS was never running around in these cases picking fights or otherwise causing the Debtors to incur legal fees they would not otherwise have incurred.  Far from it.  LBBS

performed the services that were required to administer the Debtors' estates, no more, no less.  No rabbit holes were gone down.  No dead ends were pursued.  No windmills were jousted with.  If anything was neither necessary to the administration of the bankruptcy estates, nor reasonably likely to benefit the bankruptcy estates at the time the services were rendered, it simply was not done.

### 4.       The services were performed in a reasonable amount of time

104.    At all times, the services performed by LBBS were performed in a reasonable amount of time.  For example, when management of the Debtors requested LBBS to file motions, such as motions under section 363 to respond to capital calls, make cash infusions, or to make loan to entities in which they have made investments, LBBS filed and prosecuted those motions as economically as possible.  Moreover, even when objections were filed to those motions, rather than fighting for the sake of a fight, LBBS was able to resolve those objections in such a fashion that the Debtors obtained all of the relief they were asking for without the need for a hearing.

105.    As noted above, of the 3,662 time entries during the Application Period, 1,126 are for .10 hours or a total of 31 percent of all time entries.  Further, 933 of the time entries are for .20 hours, 426 are for .30 hours, and 262 are for .40 hours.  Thus, a full 75 percent of LBBS' detailed time entries are for .40 hours or less.  This data alone shows that LBBS has been very efficient and economical in its provision of legal services to the Debtors.

106.    Among the services performed by LBBS, the process of negotiating, drafting, and redrafting the forbearance agreements, the new security agreements, and the UCC-1 financing statements has drawn the most attention.  Recall that the concept of dismissing these cases under the protections afforded by forbearance agreements signed by the noteholders and bondholders so that any deficiencies in the creation and perfection of their security interest could be corrected was

first discussed in a conference call on August 10, 2020.  By August 20, 2020, LBBS had completed its initial draft of the security agreement, and by September 3, 2020, had created its first draft of the security agreement.  Because of all of the changes that resulted from negotiations with other parties in interest, in particular Accelerated Wealth and its securities and bankruptcy counsel, the forbearance agreements and security agreements were not finalized and ready for distribution to the Debtors' investors until December 15, 2020, nearly four months later.

107.    For all of the foregoing reasons, the amount of time spent by LBBS from the Petition Date through the date the orders of dismissal were entered was reasonable.

### 5.    LBBS has demonstrated skill and experience in the bankruptcy field

108.    Biographical information regarding the attorneys of LBBS who performed services for the Debtors in these cases can be found at www.lewisbrisbois.com.  The Debtors' lead bankruptcy counsel, Mr. Parks, began his career in Chapter 11 practice over 40 years ago as one of several dozen attorneys representing White Motor Corporation and several of its subsidiaries in what was, at the time of its filing, the largest Chapter 11 case to have been filed under the Bankruptcy Reform Act of 1978.  After cutting his Chapter 11 teeth on the White Motor case, Mr. Parks joined a team of lawyers representing Terex Corporation, a former subsidiary of General Motors, in its reorganization proceeding.  Thereafter, Mr. Parks switched to the creditor's side, representing the Federal Savings & Loan Insurance Corporation in the Chapter 11 reorganizations of The Hilton Head Corporation and The Sea Pines Plantation Company.  After relocating to Denver, Mr. Parks represented a number of Chapter 11 debtors in reorganization proceedings in Colorado before he joined a team of lawyers in Phoenix that reorganized America West Airlines.  After spending over four years on the America West case in Arizona, Mr. Parks spent the following three years representing the Chapter 11 trustee of Cajun Electric Power Cooperative, Inc., in

Louisiana. The highlight of the Cajun Electric case was a 63-day trial on three competing plans of reorganization which began in December of 1996 and concluded in June of 1999, undoubtedly the longest confirmation hearing in the history of American bankruptcy law. The trustee's plan of reorganization was ultimately confirmed, and the cooperative's assets were sold for $1.2 billion. Mr. Parks' more recent Chapter 11 representations have included representing the Chapter 11 trustee of Southern Montana Electric Generation and Transmission Cooperative, Inc., in one of the largest reorganization cases ever to have been filed in the state of Montana and serving as Chapter 11 counsel for Cascade Integrated Services, LLC, in a case in which the debtor was able to pay its principal secured creditor, Wells Fargo Bank, in full, and in which a liquidating plan of reorganization was confirmed under which unsecured creditors received significant distributions. The foregoing cases are merely highlights from Mr. Parks' career in the Chapter 11 arena and are by no means an exhaustive list of all of his experience in Chapter 11 cases.

109.     Mr. Parks, therefore, brought four decades of Chapter 11 experience to the table in representing the Debtors in these cases. LBBS submits that that level of experience, coupled with the skills demonstrated by all of its attorneys in these case, has served the Debtors, their bankruptcy estates, creditors, and other parties in interest well.

### 6.      The compensation requested is reasonable by comparison to other cases

110.     According to one Chapter 11 fee study – The Chapter 11 Fee Study: Moving Forward Analysis, ABI Southeast Bankruptcy Conference (2008) (available to ABI members at https://www.abi.org/education-events/sessions/the-chapter-11-fee-study-moving-forward-analysis) (the "**ABI Study**"), dismissal was the most common outcome in cases sampled, with than 45 percent of the cases leaving Chapter 11 via dismissals. *Id*. at p. 324. Further the total professional fees awarded in the study averaged a total of about 4 to 4.5 percent of the sum of the

assets and liabilities of the debtor. *Id*. at p. 331. Therefore, according to the study, $10 million in assets and liabilities would result in $400,000 in fees. *Id*. Granted, the formula is followed by a question mark, suggesting that it is a rough estimate only, but the study does provide at least some context for evaluating the fees in these cases in comparison to other cases.

111.   Here, according to their respective Official Form 206Sum filings, the combined assets and liabilities of both Debtors is approximately $95 million. Using the formula in the ABI study, the total amount of assets and liabilities of both Debtors would suggest that the total professional fees in these cases should be in the range of $3.8 million to $4.275 million. Obviously, the total fees, including the fees requested by LBBS herein, do not even approach those sums. Moreover, even if one were to argue that, because the Debtors' cases did not move through the plan confirmation process, the fees in these cases should have been less than those in the ABI study's formula, since nearly half of the cases in the study involved dismissals, cutting the results of the ABI fee formula by half would result in total expected professional fees in the range of $1.7 million to $2.14 million.[8]

112.   Although it may be difficult, if not impossible, to perform an apples to apples comparison between the Debtors' cases and other Chapter 11 cases, the ABI Study suggests that the total fees requested by LBBS in the amount of $726,442.50 are well within the range of reasonableness.

---

[8] Even when combined with fees already awarded to BKD, LLP for tax return preparation services and to counsel for the Bondholders' Committee, the fees applied for by the Gordon Davis law firm as special counsel for ASIC, and the fees expected to be applied for by counsel for the Bondholders' Committee and special counsel to the Equity Members Conflicts Committee, it is expected that the total fees of all professionals in these cases will be well under $1 million. Typically, except perhaps in "mega" cases, the fees of bankruptcy counsel for the debtor account for the majority of the professional fees in a Chapter 11 case.

**B.**     **Application of the *Johnson* Factors**

**1.     Time and labor required**

113.     As previously demonstrated above and in the exhibits attached hereto, LBBS has provided detailed descriptions of the time and labor required to shepherd the Debtors through their Chapter 11 cases.  The total number of hours expended, 1,637.80, demonstrates that LBBS has assisted the Debtors through all aspects of their bankruptcy cases.  During the Application Period, LBBS' hours have averaged  148.89  hours per month and its fees have averaged $69,035.68 per month for both the Debtors' cases.  Given the size and complexity of these cases, including the total dollar value of assets and total dollar amount of scheduled claims, the number of motions that have had to be filed and objected to, the litigation initiated against the Debtors, and the efforts that were undertaken to explore alternatives to reorganizing the Debtors of under Chapter 11 of the Bankruptcy Code, the time spent by LBBS was commensurate with the amount of labor that was required.

**Novelty and Difficulty of the Questions**

114.     A number of novel and difficult questions arose in these cases.  For example, the legal issues involved in the motion for relief from stay regarding ASIC's management rights in High Desert Garden Holdings were myriad and complex.  Also, many of the Debtors' motions for authority to make cash infusions into or loans to wholly or partially owned operating subsidiaries have presented complex factual analyses of the subsidiary's historical, current, and projected financial condition.  Further, the negotiations which resulted in the dismissal of these cases pursuant to forbearance agreements executed by all but a few of ASIC's noteholders and ASICIF's bondholders included the consideration of a number of difficult and complex strategic as well as practical issues.  Finally, whether structured dismissals of Chapter 11 cases are permissible and, if

so, what terms and conditions courts are willing to include in a dismissal order are issues that are both novel and difficult.[9]

### Skill Requisite to Perform Legal Services Properly

115.    In rendering services to the Debtors, LBBS has demonstrated expertise regarding the Chapter 11 process generally, skillfulness in drafting motions and other papers filed with the Court,  and prowess in arguing the Debtors' positions in contested matters.

### Preclusion of Other Employment by Attorney Due to Acceptance of Case

116.    Certain of LBBS' attorneys have been precluded from devoting time to other matters because of the time requirements of these cases.  For example, because of the time requirements of these cases, Mr. Parks has had to pass work on in two other matters to other attorneys at LBBS for which he could have charged clients at hourly billing rates equal to or higher than his hourly billing rate in these cases.

### Customary Fee

117.    As has already been demonstrated above, the hourly rates attorneys and other timekeepers charged by LBBS in these cases are well below the rates the firm typically charges in matters involving comparable complexity.  Further, LBBS has found that the hourly rates of its professionals are at or below the prevailing "market" hourly rates in this jurisdiction.

### Whether Fee is Fixed or Contingent

118.    LBBS' compensation in this matter is subject to approval of the Court and, at least in that sense, is contingent.  LBBS employment has been on an hourly basis, meaning that it fees are the product of the amount of time spent on any given tasks multiplied by the applicable hourly

---

[9] For example, notwithstanding the Supreme Court's decision in *Czyzewski v. Jevic Holding Corp.*, ___U.S. ___, 137 S. Ct. 973, 979 (2017), LBBS was informed that the position of the UST is that "structured" dismissals are not permissible and that cases are either dismissed or they are not.

rate of the timekeeper performing the task.

## Amount Involved and Results Obtained

119.   LBBS appreciates that the total fees requested by this application are not insignificant.  The amount of those fees, however, is both reasonable and justified given the total amounts of the Debtors' assets and  liabilities, the considerable work that LBBS has had to undertake on behalf of the Debtors since the Petition Date, and the results obtained by LBBS' efforts.

120.   As noted above, the combined total of ASIC's and ASICIF's assets and liabilities, as scheduled, is approximately $95 million.  Thus, in terms of total assets and liabilities, the jointly administered case was just shy of being a $100 million case.  It is against that dollar amount that the ABI Study measured professional fees in Chapter 11 cases.  Thus, as a percentage of the Debtors' estates total assets and liabilities, the fees requested by LBBS are approximately .8 percent of the amount involved in these cases.

121.   The Debtors filed and opposed numerous motions in these cases and were on the losing end of only a single motion – one of the motions for relief from stay filed by Roma.  LBBS filed a total of six motions on behalf of the Debtors seeking authority from the Court to make capital contributions or loans to entities in which they have invested.  As a result of the granting of those motions, the Debtors were able to make cash contributions and loans totaling $695,000.  Further, LBBS successfully opposed a motion for a temporary restraining order filed by Roma which, if granted, would have resulted in the immediately depletion of over $335,000 in cash from the ASICIF bankruptcy estate. Thus, the amount in controversy on those seven motions alone was over $1 million.

122.   Further, when motions filed by the Debtors were met with objections, LBBS was

able to negotiate a resolution with the objectors in such a fashion that the Debtors were able to obtain the full relief they had requested without the need for a hearing, thus saving the estates both the possible consequences of adverse rulings and potentially tens of thousands of dollars in legal fees from having to litigate over the objections.

123.    Finally, the ultimate result obtained by LBBS was the execution of forbearance agreements by 237 of 241 of the Debtors investors and the dismissal of these cases without having the Debtors incur the further expenses of going through what, based on the experience of these cases, would have likely been a hard fought and protracted  plan confirmation process.  Even to obtain a simple dismissal of these cases, the Debtors had to establish cause under 11 U.S.C. §1112(b)(4) or, in the alternative, show why dismissal was in the bests interests of creditors and the Debtors pursuant to 11 U.S.C. § 305(a)(1).

124.    Granted, the Debtors had also sought a "structured" dismissal under which the automatic stay would have been extended as to four investors – two noteholders and two bondholders – who had not signed forbearance agreements.  When LBBS first circulated a draft of the motion for dismissal to counsel for Accelerated Wealth and counsel for the Bondholders' Committee, and TCG has sent a copy  the draft to the Noteholders' Committee, a total of 14 investors – 5 noteholders and 9 bondholders – had still not signed forbearance agreements.  By the time the motion for dismissal was filed, that number had shrunk to only 4 investors who had not signed forbearance agreements.  It is entirely possible, although difficult to prove, that the mere threat of having the automatic stay extended post-dismissal is what convinced the 10 holdouts to sign forbearance agreements.  Regardless, because of the paltry number of investors who had not signed forbearance agreements and the total amount of their claims, not obtaining an extension of

the automatic stay turned out to be not to be of much consequence to the Debtors.[10]   The Debtors' primary goal was to obtain near universal participation by investors in the forbearance process so as to allow for the dismissal of these cases with effectively the same protection afforded by the automatic stay of section 362(a) of the Bankruptcy Code.   That goal was undeniably achieved.

### Time Limitations Imposed by Client or Other Circumstances

125.   Other than pulling Mr. Parks away from other client responsibilities as mentioned above, the time constraints imposed in these cases on LBBS have not been out of the ordinary.   The ongoing global pandemic has, of course, made certain forms of communication, serving papers on the parties on the creditor matrices, and other case management matters challenging at times, but those limitations have always been overcome.

### Experience, Reputation and Ability of the Attorneys

126.   LBBS' attorneys are experienced and able in matters of this kind, and have a reputation commensurate with such experience and ability.   The experience and accomplishments of the LBBS attorneys who have worked on these cases can be found in their biographical information at www.lewisbrisbois.com.

### Undesirability of Case

127.   These cases have in no way been undesirable.   LBBS considers itself privileged to have the opportunity to represent the Debtors and to have been of assistance in protecting the interests of their investors and other creditors.

### Nature and Length of Professional Relationship with Client

128.   Pre-petition, LBBS briefly represented through the Debtors' manager, TCG, the various entities it manages, including the Debtors.   The firm's representation of the Debtors

---

[10]  LBBS is informed that after the orders of dismissal were entered, another noteholder signed a forbearance agreement.

included assisting them in their efforts to have ASIC's noteholders and ASICIF's bondholders execute forbearance agreements aimed at avoiding the necessity for the Debtors to seek the protection of the automatic stay through bankruptcy filings.

## Awards in Similar Cases

129.    The amount requested by LBBS is reasonable in terms of awards in cases of similar magnitude, complexity, and time constraint.  The compensation that LBBS requests comports with the mandate of Title 11, which directs that services be evaluated in light of comparable services performed in non-bankruptcy cases in the community.  The fees requested by LBBS through this interim application reflect an average hourly rate of $464.  The expenses that LBBS seeks reimbursement of were necessarily incurred as a result of this engagement.  Such expenses are not, therefore, implicit in LBBS' hourly rates.

130.    Finally, as noted above, according to the ABI Study, the fees requested by LBBS for its work in these cases are far less than fee awards in similar cases.

## VII.    COMPENSATION AND EXPENSES RECEIVED TO DATE

131.    One prior fee application has been filed by LBBS but it was voluntarily withdrawn after it had become a certainty that none of its fees could be paid in the year 2020 because an evidentiary hearing on the application could not be scheduled until January 2021.

132.    LBBS has not received any compensation for any fees for services rendered or expenses incurred after the Petition Date.

WHEREFORE, LBBS requests that the Court consider this Application and thereupon enter an aggregate award in the amount of $735,326.04, which amount consists of (i) legal fees in the amount of $726,442.50, for services rendered during the Application Period; (ii) reimbursement for actual and necessary expenses in the amount of $8,883.54 incurred by LBBS during the Application

Period; (iii) ordering ASIC to pay LBBS the sum of $170,828.50 in legal fees and the sum of $1,831.05 for expenses and entering a judgment against ASIC thereon; (iv) ordering ASICIF to pay LBBS the sum of $555,614.00 in legal fees and the sum of $7,052.49 for expenses and entering a judgment against ASICIF thereon; and (v) such other and further relief as the Court deems appropriate.

Dated: May 17, 2021                                    Respectfully submitted,

/s/ John Cardinal Parks
John Cardinal Parks. 18669
LEWIS BRISBOIS BISGAARD & SMITH LLP
1700 Lincoln Street, Suite 4000
Denver, Colorado 80203
Phone: (303) 861-7760
Fax:    (303) 861-7767
Email: John.Parks@lewisbrisbios.com

*Bankruptcy Counsel for the Debtors*